IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


MARK MANNINGS,                          )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )          CIVIL ACTION NO. 2:02CV1246-ID
                                        )
ROY HIGHTOWER, WARDEN, et al.,          )
                                        )
                    Defendants.         )


**RECOMMENDATION OF THE MAGISTRATE JUDGE**


Mark Manning ["Manning"], an Alabama prisoner incarcerated at the William E.

Donaldson Correctional Facility, filed this *pro se* 42 U.S.C. § 1983 action alleging a number of

constitutional violations, most of which were dismissed on prior recommendation of Magistrate

Judge Vanzetta McPherson.[1]  The sole remaining claim is the constitutional claim of excessive

force against Leeposey Daniels ["Daniels"],[2] and Anthony Gibson ["Gibson"].[3]  Manning seeks

monetary damages, namely "taxation to be placed upon the officers involved, towards the

establishment of a non-profit organization for the benefits of inmates at the such said

---

[1]See, Doc. #21, pp. 1-2.

[2]Warden II stationed at Montgomery pre-release center, the William E. Donaldson Correctional
Facility ["Donaldson"] located in Mt. Meigs, Alabama
. (50)  At the time of the incident forming the basis of this complaint, Daniels was a
Captain/Correctional Officer Supervisor at Kilby Correctional Facility ["Kilby"].

[3]Former Correctional Officer at Kilby.  Gibson resigned his employment in 2001 (TR 101).

institutions," and "the expulsion of their employment."[4]

In response to plaintiff's claims for relief, Defendants filed a special report and supporting evidentiary material in response to the allegations contained in the complaint (Doc. # 13), and plaintiff responded (Doc. #18).  Defendants' motion for summary judgment was granted in part, and denied in part.[5]  An evidentiary hearing was held on February 8, 2007 on the remaining claims.

## I.  FACTS

Plaintiff was transferred from Donaldson Correction Facility ["Donaldson"] in Jefferson County to Kilby Correctional Facility ["Kilby"] in Montgomery County on April 13, 2001 for a mental status examination.  While being processed in a temporary holding area at Kilby (TR 30), the guards began to inventory Plaintiff' property, including certain religious artifacts (TR 38).  Plaintiff objected verbally to his property being confiscated, by complaining that certain artifact had been taken previously and said to the intake officer, "you know how these [niggers] are." (TR 13) He indicated at the hearing that his belongings had previously been taken from him and scattered in camp, rather than given back to him.  Upon saying the word, "nigger,"[6] plaintiff claims that Officer Anthony Gibson [Gibson] came towards him swinging a baton,

---

[4]Doc. #13, p. 8.

[5]See, Order granting Hightower's, Edward's, Gibson's and Daniel's motion for summary judgment on Mannings' First and Eighth Amendment overcrowding claims; denying Gibson's and Daniel's motion for summary judgment on Mannings' Eight and Fourteenth Amendment claim of excessive force.

[6]Manning is himself an African American.

goading him to "say it [nigger] again" repeatedly.[7]  Plaintiff testified that shortly thereafter, there was an incident with Gibson where he "pulled his baton out and several other officers got into the mix with it." (TR 13)  The primary thrust of Manning's testimony was that Officer Gibson was swinging his baton at his head "like a baseball bat." (TR 14)  This incident happen in plain view of other inmates in the intake area (TR 34), but there was no affidavits or substantiating testimony by any other witness. (TR 32)  Neither was the incident mentioned in the official report and was denied by all of the correctional officers at trial.

Richard Naile [Naile], a corrections officer at Kilby, testified that, seeing the intake officer was having difficultly with Plaintiff, Defendant Gibson came over to "give support to his fellow officer." (TR 38)  Naile testified that Manning began getting louder (TR 38).  The institutional Incident Report stated "COI Gibson approached inmate Manning and verbally reprimanded him concerning his disruptive behavior." (Exhibit 3, p. 1)  Testimony by Naile also indicated that batons were not generally carried by correctional officers in the intake area at Kilby. (TR 45)  However, this testimony was contradicted by Officer Rubin Evans who later testified that batons were "generally" carried by officers in the intake area (TR 88), but with some prompting from defense counsel, indicated that the officers party to this suit were not wearing batons at the time of the events occurring on April 13, 2001. (TR 94)

Sargent Naile testified that "[e]verything [thereafter] I said seemed to irritate him [Manning] further." (TR 39)  Manning became more boisterous using words like "you

---

[7]This is an interesting turn of events considering Officer Gibson is Caucasian.

3

motherfuckers need to quit taking my goddamn shit, all my fucking property." (TR 39)  Naile

testified that Manning said to the other inmates in the area, "[D]on't let these niggers do this shit

to me."  At that time, Naile concluded Manning was trying to get the support of other inmates.

(TR 39)  The following events were described in the Incident Report: "Inmate Manning was

then verbally reprimanded by Sgt. Richard Naile concerning his loud and disruptive behavior.

Inmate Manning continued to progressively become more uncontrollable and was immediately

ordered to submit to a strip search and restrained in handcuffs and legirons [leg irons].  Once the

strip search and restraint of inmate Manning was completed, his behavior became increasingly

hostile."  Id, p. 1.[8]

Plaintiff testified that they then put the shackles and handcuffs back on him, and began

escorting him "somewhere," he wasn't sure.  Gibson was leading, and Naile was holding him by

the shoulder pushing him towards Gibson, who allegedly, was sticking out his rear suggestively.

Plaintiff indicated that Naile was trying to shove him into Gibson, and plaintiff was resisting

being pushed.  Plaintiff testified that he said, "I ain't going to fuck with you, man, so quit trying

to push me on him." (TR 15)  They then took plaintiff to the southward door of the holding cell.

Defendant Daniels, Captain of the correctional officers at Kilby at the time, testified that,

while plaintiff was still in the intake area, he was called by Naile.  Daniels told Naile to bring

---

[8]It is found that the Incident Report [Exhibit 3]  is more reliable than the testimony at trial as to
these facts.

Manning up to the holding cell (P-1)[9] "and we would strip search him there." (TR 51)[10]  Daniels met Manning at the southward entrance door to the holding cell building, escorted by Defendant Gibson and Officers Rubin Evans [Evans] and Aubrey Alexander [Alexander]. (TR 52; TR 15)  It was prior to entering the southwest entrance door to the holding cell building that Plaintiff testified he was first administer shocks by Daniels using an Ultron-II device. (TR 30-31)  Daniels and Evans denied that this incident occurred. (TR 53)

Daniels' testified that they entered and secured the hallway, meaning that the inmate were instructed to "stand up, turn around, put both hands on the wall." (TR 52)  At this time, Daniels testified that "[h]e [Manning] was shouting a lot of racial slurs, but he was complying with the orders that was given to him." (TR 53)  Per Daniels' testimony, the group was then joined by Captain Watson. (TR 54)[11]  Manning was placed in the cell, and his ankle braces were removed without incident.[12]

Daniels then testifies that the officers left the cell, and Manning was asked to back up to the tray hole slot, step up onto "the hump" so the cuff could be removed from his wrists. (TR

---

[9]P-1 was the psychological isolation unit at Kilby. (TR 52)

[10]This testimony is inconsistent with the incident report that indicated that Manning was strip-search at the intake area.  (Defendant's Exhibit 3, p. 1).

[11]Evans testified that they were joined here by" Lapier" and "Mr. Hightower." (TR 89)

[12]No direct testimony was given by Daniels regarding the circumstances of the removal of the leg braces.  The Incident Report states as follows: "Inmate Manning was then ordered to lay on his chest and stomach so that his leg restraints could be removed.  Inmate Manning did comply."  (Emphasis supplied), Exhibit 3, p. 1.  See also, Evan's testimony, indicating there was not much of a struggle removing leg irons. (TR 91)

54, 56)  Daniels' testified that Manning did not comply for almost ten to fifteen minutes. (TR

57)  This last testimony is wholly inconsistent with the Incident Report wherein it was stated:

> Inmate Manning was then ordered to stand up and back up against his cell door
> to have his wrist restraints removed.  He became passively defiant and then
> aggressively defiant, and would not stand up.  Inmate Manning then began to turn
> away from us while an attempt was made to stand him up.  Cpt. Daniels then
> gave inmate Manning a direct order to stand up or he would use force to have
> him comply with the direct order.  Inmate Manning continued to be defiant.  Cpt.
> Daniels then applied an electronic hand-held device to bring inmate Manning
> into compliance.  Inmate Manning then reached for the device despite the fact
> that he was restrained.  COI Alexander then applied CS/CO (Freeze+P) to deter
> inmate Manning from gaining control of the electronic hand device.  At this time,
> inmate Manning ceased his resistance and became compliant. (Exhibit 3, p. 1)[13]

Exhibit 3 is consistent with Plaintiff's testimony that he was "tasered" and "pepper

sprayed" while lying face down on the ground in the P-1 cell. (TR 17)  Thus, it is found that

there was no "gap" between the time plaintiff's leg iron were removed, and the ensuing order to

stand up and back against his cell door to have his wrist restraints removed.  Based on the

Incident Report, which facts were taken down shortly after the incident, it is doubtful whether

the four guard ever left the cell before administering the electronic shocking device and the

CS/CO (Freeze +P) spray.

It is undisputed that, after the chemical spray was administered, Manning became

compliant. (TR 60)  He was taken to the shower, then to the exercise yard where a body chart

was performed. (TR 62)  Plaintiff complained of his eyes burning. (TR 24)

---

[13]It is noted that Officer Gibson's testimony was inconsistent with the Incident Report (*that he
authored* (TR 118)), and so embellished that it is not credible.

## II.  STANDARD OF REVIEW

Defendants brought a motion for judgment as a matter of law both at the beginning of the evidentiary hearing, and again at the close of their proofs.  Under properly pled facts, a plaintiff can bring a suit that certain behaviors of excessive force exercised by officials in their individual capacity, "maliciously and sadistically to cause harm," constitutes a constitutional violation under the cruel and unusual punishment provision of the Eighth and Fourteenth Amendments.  *Skrtich v Thornton,* 280 F.3d 1295, 1301 (11th Cir. 2002), citing *Hudson v McMillian*, 503 U.S. 1 (1992), and *Whitley, supra*.  In a previous Order of this court, it was found that plaintiff survived Defendants Gibson and Daniels Motion for Summary Judgment, and properly pled facts sufficient to proceed on his Eighth and Fourteenth Amendment claims.  Since the evidence at hearing goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternative, and could, if viewed in the light most favorable to plaintiff, support a reliable inference of wantonness, a decision cannot be made as a matter of law.  *Whitley v Albers,* 475 U.S. 312 (1986).   Thus, it is recommended that defendants' motion be denied.  Rather, in light of the fact established at hearing, we undertake an analysis of whether the behavior of the correction officers, in this case, used force maliciously and sadistically.

## THE EXCESSIVE FORCE CLAIM

A variety of factors are considered to determine if excessive force, used by a correctional officer in his or her individual capacity, has been used against a confined inmate:

7

> To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force, the relationship between that need and the amount of force use, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson,* at 7-8, 112 S.Ct. 995; *see also Whitley,* 475 U.S. at 321, 106 S.Ct. 1078; *Harris v Chapman*, 97 F.3d 499, 505 (11th Cir. 1996). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley,* 475 U.S. at 321, 106 S.Ct. 1078 (quoting *Johnson,* 481 F.2d at 1033).

*Skrtich,* 280 F.3d at 1300-1301. This is true even though a prisoner does not suffer serious injuries. *Id.* 503 U.S. at 9. "It is the obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restraining official control over a tumultuous cellblock." *Id.,* at 1084. Pursuant to the actual language of the Eighth Amendment, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." This language imposes limits on the power of those entrusted with the criminal-law function of the government. *Whitley,* 430 U.S. at 1083; *Ingraham v. Wright*, 430 U.S. 651, 664, and it is in light of this standard that we review these facts.

In the instant case, the need for force in this prison setting was in response to the perceived threat that plaintiff's loud and unruly behavior, as well as his calls for assistance to other inmates when his property was taken in the intake area, created a security threat. The undisputed testimony established that there was a large number of inmates in the intake area (15-20), and only a limited number of guards. (TR 87-89) Generally, during the intake process,

8

the inmate's shackles and handcuff were removed. (TR 88)  Therefore, Naile's and Gibson's

verbal reprimand of Manning in the intake area was appropriate.  Also, even if Gibson was

swinging a baton towards Manning to intimidate him into submission, it was in response to the

perceived threat that a riot could ensue.  In light of the perceived threat that there could be

further disruption by other inmates, the verbal reprimand, and even the intimidating behavior,

was not so egregious so as to rise to the level of a constitutional violation .  *See McFadden v*

*Lucas*, 713 F.2d 143 (5th Cir. 1983) (Threatening, derogatory or abusive comments made by a

jailer to an inmate does not rise to the level of a constitutional violation); *see also Johnson v*

*Glick,* 481 F.2d 1028 (2nd Cir. 1973) ("Not every push or shove, even if it may later seem

unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

Even if a baton was swung toward plaintiff, it is found that this force was de minimus in light of

the threat posed to the security of the prison.  An excessive force claim "necessarily excludes

from constitutional recognition *de minimus* uses of physical force, provided that the use of force

is not a sort 'repugnant to the conscience of mankind.'" *Hudson,* 503 U.S. at 9-10 (quoting

*Whitley,* 475 U.S. at 327).  Plaintiff admits that the baton did not touch him. (TR 25)

    More disturbing is if Daniels used the electronic device when he met plaintiff at the

south door of the holding cell unit, prior to entering.  Daniels, Evan and Gibson testified that

plaintiff was not shocked at this time, or in the hallway thereafter.  Plaintiff testified that he was

shocked here for no reason.  However, there are inconsistencies with plaintiff's account at this

point.  In his direct examination he indicated that Daniels "started tasing me in the side...,"

outside the door, and that he "pushed his arm away because it was hurting...." (TR 16) In cross

examination he was confronted with the inconsistency of his written statement wherein he stated

9

that Daniels "began to use a taser until [he] begged him to stop." (TR 22) There were other inconsistencies between plaintiff original complaint and statement, admitted in his testimony at hearing. (See, TR 22-24)  Later, plaintiff testified that he was "tased" in the hallway, and that other inmates would have been able to observe this. (TR 31) Yet plaintiff had no affidavit or other documentary evidence to support this allegation. (TR 31-32)  He also did not identify any witnesses in his pleadings, (TR 32), and his description is inconsistent with the Incident Report. Therefore, it is the finding of this court that plaintiff credibility is in question as to this event[14] and, based upon the evidence presented, he has not established that this incident occurred. Thus, we do not reach the issue of whether their was an Eighth Amendment violation as to this incident.

Once at the P-2 holding cell, the circumstances changed.  There were a variety of different accounts, by plaintiff and the correctional officers.[15]  The incident report, however, suggests that directly after the shackles were removed, plaintiff was ordered to stand up and back against his cell door to have his wrist restraints removed, that he would not stand up, a direct order was given for him to stand up, and that, refusing to stand, the hand-held electronic

---

[14]It is also noted that plaintiff was previously diagnosed as a paranoid schizophrenic (TR 19); he was taking Elavil at the time these incident occurred, though he was not sure if he had taken it that day (TR 34); and at the time of hearing he was taking Prolixin for the same condition. (TR 35)

[15]Plaintiff testified that he was taken to the P-1 cell, place face down, and while shackled and handcuffed, he was tasered and sprayed. (TR 17) Daniels and Gibson testified that the leg irons were taken off plaintiff, all the officers went out of the room and plaintiff was instructed to come to the door window so that the handcuff could be removed.  They also testified that they were out of the cell for ten to fifteen minutes, and Daniels was continuing to give the order to stand up and go to the window for the handcuff to be removed (TR 91-92, 113).

device was applied.  When the device was applied, plaintiff reached for it, and the CS/CO

(Freeze+P) was administered. (Exhibit 3, p. 1)  The Incident Report suggests there was no lapse

in time (up to 15 minutes) as testified to by Daniels and Gibson.

Regardless of whether their was a time lapse or not, when in the P-1 holding area, the

officers were no longer concerned with a riot ensuing, and plaintiff was confined in the cell.

The officers expressed at trial that what they were concerned with at that point is for plaintiff's

safety,[16] and later, upon reentry, they were concerned with plaintiff taking the electronic device

from Defendant Daniels.

If defendants never left the P-1 cell, there would be no concern for his safety because

plaintiff was face down on the ground, and according to the Incident Report, would not get up.

Assuming this to be true, the question becomes, was it reasonable to apply the electronic

shocking device to plaintiff's thigh (or side) upon plaintiff's failure to respond to a direct order

to stand at the window to have his handcuffs removed while four guards were still in the holding

cell and plaintiff was face down on the ground?  It is found that it was.  Plaintiff failed to

respond to a direct order to stand up for purposes of having the handcuff's removed.  And, even

though the other measures could have been taken (i.e. the four guards could have simply

removed the cuff while plaintiff was on the ground), the shocking device was used in an attempt

to bring the prisoner into compliance with what was being asked of him.  We recognize that it is

important for inmates to comply with reasonable orders from the correctional officers in charge

---

[16]Officer Gibson, embellishing on his own report testified, if the cuff were left on plaintiff, he
could trip over items in the cell, fall forward and injure himself. (TR112)

of their supervision.  Otherwise, disruptions would be frequent, and prison havoc would reign.

When plaintiff reached for the shocking device, even with his hand still cuffed behind his back, Defendant Daniels gave the order to use the chemical spray.  Plaintiff admits that he reached for the device, but only for the purpose of pushing it away. (TR 16)   This is a distinction without a difference.  It was reasonable for the officers in the cell to *perceive* a threat to security with defendant reaching for the device (or Daniels arm) *for whatever reason*, whether it be to take it from the officer or push it away.  Therefore, it is found that the need for application of the chemical spray, and the order given by defendant Daniels, was related to the threat reasonably perceived.  "Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied 'in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm.'" *Whitley,* 475 U.S. at 320-21 (quoting *Johnson v Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973).  Plausibly the force was thought necessary, and it is found that it was neither wanton or unjustified,[17] but rather was applied in a good-faith effort to restore discipline.  *Id.,* 475 U.S. at 320.

Undisputed is that the severity of the forceful response was then temper by the officers immediately taking plaintiff to the shower, and out into the fresh air, once he became compliant to defendant Daniels' order to allow the cuff to be removed.  While there, he was evaluated by a physician.  Plaintiff claimed only burning in his eyes, and no other injuries.  While the existence

---

[17]"...inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur."  *See*, *Whitley,* 475 U.S. at 321 (quoting *Johnson,* 481 F.2d at 1033).

and extent of injury is not dispositive, it may be considered to determine if the use of force is wanton and unnecessary. *Hudson,* 475 U.S. at 996. Viewing the evidence, even in the light most favorable to plaintiff, it is recommended that the evidence does not support a reliable inference of wantonness in the infliction of pain to rise to a constitutional violation under the cruel and unusual punishment provisions of the Eighth and Fourteenth Amendments, in light of the security risk pose and the need to restore order in the facility.

## CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The motion for judgment as a matter of law on behalf of the defendants be denied.

2. The charges by plaintiff against the defendants Leeposey Daniels be dismissed on all counts.

3. The charges by plaintiff against the defendants Anthony Gibson be dismissed on all counts.

4. It is further ORDERED that the parties are DIRECTED to file any objections to the said Recommendation within a period of 13 days from the date of mailing or transmittal to them. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 23[th] day of February, 2007.


/s/Wallace Capel, Jr.

WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE

14